County of Milwaukee, Plaintiff-Respondent,

v.

Lawrence C. Williams,
Defendant-Appellant-Petitioner.

County of Milwaukee, Plaintiff-Respondent,

v.

Russell L. Hegney,
Defendant-Appellant-Petitioner.

Supreme Court

*Nos. 2005AP2686, 2005AP2687. Oral argument March 6, 2007.
—Decided June 12, 2007.*

2007 WI 69

(Also reported in 732 N.W.2d 770.)

For the defendants-appellants-petitioners there were briefs by *Peter C. Carstensen & William Rosales* and *University of Wisconsin Law School,* Madison, and *Douglas P. Dehler* and *Shepherd, Finkelman, Miller & Shah, LLC,* Milwaukee, and oral argument by *Peter C. Carstensen.*

For the plaintiffs-respondents there was a brief by *Thomas J. McAdams,* assistant district attorney and *E. Michael McCann,* district attorney, Milwaukee, and *William J. Domina,* Milwaukee County Corporation Counsel and *Timothy R. Karaskiewicz,* principal assistant corporation counsel, Milwaukee, and oral argument by *Timothy R. Karaskiewicz.*

An amicus curiae brief was filed by *Gwendolyn J. Cooley,* assistant attorney general with whom on the brief was *J.B. Van Hollen,* attorney general.

¶ 1. ANN WALSH BRADLEY, J. The petitioners, Lawrence C. Williams and Russell L. Hegney, seek review of a published court of appeals decision that affirmed judgments of conviction. The defendants were found guilty of picking up passengers in their taxis at General Mitchell International Airport ("Airport") without an Airport permit, in violation Milwaukee County Ordinance 4.05.[1] They assert that Ordinance 4.05 is invalid on several grounds: (1) that Ordinance 4.05 conflicts with Wis. Stat. § 114.14;[2] (2) that Ordinance 4.05 conflicts with Wis. Stat. §§ 133.01, 349.24, and 194.02; and (3) that the restrictions on prearranged taxi service in Ordinance 4.05 are unconstitutional because they impermissibly interfere with interstate commerce.

¶ 2. We determine that Ordinance 4.05, which prohibits taxis without Airport permits from making prearranged pickups, conflicts with the requirement under § 114.14 that the public have equal access to airport services, and to that extent is invalid and unenforceable. However, we determine that Ordinance 4.05 does not conflict with Wis. Stat. §§ 133.01, 349.24, and 194.02. Because our decision rests on statutory grounds, we do not reach the question of whether the restrictions on prearranged taxi service in Ordinance 4.05 impermissibly interfere with interstate commerce.

¶ 3. Fundamentally, this case is about whether part of a county ordinance conflicts with a state statute

---

[1] *See County of Milwaukee v. Williams, County of Milwaukee v. Hegney,* 2006 WI App 153, 295 Wis. 2d 389, 720 N.W.2d 177 (affirming judgments of the circuit court for Milwaukee County, Daniel L. Konkol, Judge). The court of appeals granted a motion by Williams and Hegney to consolidate their cases for appeal.

[2] All references to the Wisconsin Statutes are to the 2005–06 version unless otherwise noted.

passed by the legislature. Ultimately, it is about whether that part of the Ordinance arbitrarily excludes members of the public from equal and uniform use of the Airport.

¶ 4. This case, however, is not about requiring the Airport to return to an "open" taxi system where there was no limitation on taxis conducting business at the Airport. The record demonstrates the need for Milwaukee County to regulate commercial ground transportation at the Airport. It recognizes how Milwaukee County has made great strides in reducing congestion, increasing efficiency, and enhancing safety at the Airport.

¶ 5. The error here is not remedied by a return to the open system. Rather, it is remedied by the elimination of an arbitrary exclusion. Accordingly, we reverse the court of appeals, and remand with instructions to vacate the judgments of conviction.

I

¶ 6. The factual record is limited in this case. It is based on a stipulation of facts agreed to by the parties together with affidavits incorporated into the stipulation.

¶ 7. Until the late 1980s, General Mitchell International Airport had an "open" taxi system that did not limit taxis from conducting business at the Airport. The open system led to a number of problems. Taxis had to wait up to five hours for customers, and because of the long wait they sometimes would refuse "short-haul" fares. The Airport's limited space led to a chaotic taxi staging area, with taxi traffic that spilled onto the Airport's roadway. This created a safety problem for the

Airport's non-taxi traffic. The congestion and chaos from taxis jockeying for position led to fights between taxi drivers.

¶ 8. In addition to problems created by too many taxis vying for fares, the open system created problems of too few taxis at off-peak times. Passengers seeking curbside taxi pickups endured long waits for rides.

¶ 9. In the late 1980s, Milwaukee County ("County") addressed these problems by adopting Ordinance 4.05, which regulates commercial ground transportation at the Airport. The Ordinance requires that taxis picking up passengers at the Airport have a permit from the Airport in addition to the city, town, or village license required under Wis. Stat. § 349.24. Milw. County Ord. 4.05(3)(b)(5), 4.05(3)(b)(1). Under Ordinance 4.05, the number of permits issued for taxis to do business is capped at 50, though the Airport Director is authorized to request additional taxis to meet immediate demand under extraordinary circumstances (for example, large conventions or inclement weather). Milw. County Ord. 4.05(3)(b)(3)(a). Under an exception to the permit rule, taxis are not required to have permits in order to drop off passengers at the Airport. Milw. County Ord. 4.05(3)(b)(5).

¶ 10. Limousines are not subject to permit requirements, but are allowed to take customers only on a prearranged (or in the words of the Ordinance, "prereserved") basis. Milw. County Ord. 4.05(6). Under the Ordinance, the limousines have a designated area to meet their prearranged passengers.[3] Non-permitted

---

[3] The Ordinance defines "luxury limousine" as:

[A] for-hire ground transportation vehicle, regularly engaged in the business of carrying passengers for hire, having a maximum seating capacity of six (6) persons, unless the size of the group

taxis are prohibited from using that designated area and are excluded from being at the Airport to meet prearranged passengers.

¶ 11. Since the adoption of Ordinance 4.05, the problems of the open system have abated. The time that taxis must wait for fares has decreased, and the time that passengers must wait for curbside taxi service has decreased. The cap on taxi permits has reduced the congestion problems, and taxis no longer spill into the Airport roadway to create a hazard for other Airport traffic. The limited number of taxis also allows Airport staff to inspect periodically the taxis servicing the Airport, which has resulted in taxis that are better maintained and cleaner than under the open system.

¶ 12. Taxis provide service using two distinct methods. The first is curbside service, which is on-demand service where passengers get taxis without having made a prior agreement to meet the taxi. The second is "prearranged" or "prereserved" service. It involves a prior agreement to pick up a passenger at a particular time and place. In the case of prearranged airport service, a reservation typically is made prior to the traveler's departure. The requirement that taxis have an Airport permit to "do business" at the Airport encompasses both curbside and prearranged pickup services.[4]

---

dictates a larger vehicle, behind the driver and which is a top of the line American or foreign production or custom automobile designated by its manufacturer as a limousine and which has custom nonproduction features.

Milw. County Ord. 4.05(6)(a)(2).

[4] The petitioners appear to assert that Ordinance 4.05 creates an "absolute" ban on taxis providing prearranged service. There is nothing in the record that supports this claim, and they do not cite a provision in the Ordinance (or elsewhere)

¶ 13. Williams and Hegney were taxi drivers for Quality Cab Company, which is based in Fond du Lac. Quality Cab has relationships with individuals and businesses in the Fond du Lac area that request Quality Cab provide transportation to and from the Airport. As of January 2005, Quality Cab did not have a valid Airport permit, and thus Williams and Hegney did not possess valid permits pursuant to Ordinance 4.05(3)(b)(5).

¶ 14. On different dates in January 2005, Williams and Hegney traveled to the Airport to pick up passengers who had made prior arrangements for pick-ups by Quality Cab. After ignoring warnings that they could not accept departing taxi fares from the Airport, Williams and Hegney were issued citations for violating Ordinance 4.05(3)(b)(5).

¶ 15. The petitioners did not dispute that they lacked the appropriate permits under Ordinance 4.05. Rather, they moved the circuit court to dismiss the citations, arguing that the Ordinance is invalid because it conflicts with Wis. Stat. §§ 349.24, 194.02, and 133.01. After the circuit court denied the motion, Williams and Hegney stipulated to facts and received fines of $250. The court of appeals affirmed, holding that Wis. Stat. § 114.14 provides Milwaukee County the authority to regulate taxis at the Airport, that Wis. Stat. §§ 349.24, 194.02, and 133.01 are consistent with Ordinance 4.05, and that Ordinance 4.05 was therefore valid.

that sets forth such a prohibition. In fact, the Ordinance explicitly contemplates prearranged service by permitted taxis: "Where prereserved (reservation) business is engaged in, driver shall check in with the ground transportation coordinator and provide the name(s), flight number(s) and arrival time(s) for the reserved passenger(s)." Milw. County Ord. 4.05(3)(f)(7).

## II

¶ 16. In this case we address Milwaukee County's ability to enact an ordinance that prohibits taxis without Airport permits from making prearranged pickups of customers, where the same ordinance allows limousines without permits to make such pickups.[5]

■

¶ 17. We examine whether Milwaukee County Ordinance 4.05 is in part invalid and unenforceable because it conflicts with a state statute. Resolution of this inquiry involves the interpretation of the Ordinance and the statute. Each presents a question of law which we review independently. *State ex rel. Teunas v. County of Kenosha,* 142 Wis. 2d 498, 504, 418 N.W.2d 833 (1988); *Milwaukee Police Ass'n v. Hegerty,* 2005 WI 28, ¶ 11, 279 Wis. 2d 150, 693 N.W.2d 738.

## III

¶ 18. At oral argument, the petitioners aptly described the case as follows.

> This case is about the validity of an absolute ban on my clients' providing prereserved service to arriving travelers at Milwaukee Airport just because they drive taxis rather than limousines.... In other words, if they drove a limousine, they could have met their passengers and taken them back to Fond du Lac. The basic

---

[5] The petitioners do not argue that this case is about the County's ability to enact an ordinance that prohibits taxis without Airport permits from making prearranged pickups where that ordinance allows taxis with Airport permits to make such pickups. As noted above in footnote 4, they appear to assert without citation or support in the record that all taxis are prohibited from providing prearranged service at the Airport.

question in this case is why does the Ordinance impose this restraint on taxi drivers and taxi companies? . . .

No one disputes the authority of Milwaukee County to regulate traffic and other aspects of the Airport. Petitioners do challenge the County's claim that it has unfettered discretion to impose any regulation it sees fit, regardless of the public interest.

¶ 19. The petitioners contend that the restriction is problematic in two respects. First, they argue that it is not within the County's authority to treat them (taxis without Airport permits) differently from limousines (which are not required to have Airport permits) with respect to providing prearranged service at the Airport. Second, they argue that it is not within the County's authority to require taxis to have one of a limited number of Airport permits in order to do business at the Airport.

¶ 20. The authority for counties to regulate the operation of airports derives from chapter 114. Specifically, Wis. Stat. § 114.14(1) provides that the "governing body of a . . . county may adopt regulations, and establish fees or charges for the use of [its] airport."[6] While

---

[6] Wis. Stat. § 114.14(1) states:

The governing body of a city, village, town or county which has established an airport or landing field, or landing and take-off strip, and acquired, leased or set apart real property for such purpose may construct, improve, equip, maintain and operate the same, or may vest jurisdiction for the construction, improvement, equipment, maintenance and operation thereof in any suitable officer, board or body of such city, village, town or county. The expenses of such construction, improvement, equipment, maintenance and operation shall be a city, village, town or county charge as the case may be. The governing body of a city, village, town or county may adopt regulations, and establish fees or charges for the use of such airport or landing field, or may authorize an officer, board or body of such village, city, town or county having jurisdic-

the petitioners correctly note that chapter 114 does not explicitly provide for the regulation of traffic or ground transportation, it has long been recognized that under that chapter, counties may regulate airport ground transportation.

¶ 21. In *Milwaukee County v. Town of Lake,* for example, the court examined contracts between airlines and General Mitchell Field which allowed the airlines to provide ground transportation between the air field and Milwaukee. 259 Wis. 208, 48 N.W.2d 1 (1951). The Town of Lake, adjacent to the airport, passed an ordinance prohibiting taxis not licensed by the Town from operating within its limits, and began ticketing taxis without such a license as they passed through the Town. *Id.* at 227. This court determined that the ordinance impermissibly interfered with Milwaukee County's authority to regulate the air field. It affirmed the circuit court's determination that under chapter 114, as the owner of General Mitchell Field, Milwaukee County "has the exclusive right to manage said field, including the right to regulate the ground transportation to be furnished to airline passengers arriving at and departing from General Mitchell Field." *Id.* at 231.

¶ 22. Further, the *Town of Lake* court determined that, beyond having the authority to regulate the air field, the county must regulate the field to assure the field's efficient and safe operation:

> The county . . . was bound to regulate the matters affecting the use of the field so as to produce efficiency and good order and to prevent confusion which necessarily would arise at an airfield where hundreds of thousands of passengers are annually passing through

tion to adopt such regulations and establish such fees or charges, subject however to the approval of such governing body before they shall take effect.

the gates, and which if left without regulation would hobble operations and seriously interfere with the safety and comfort of the traveling public.

*Id. See also Courtesy Cab Co. v. Johnson,* 10 Wis. 2d 426, 431–32, 434, 103 N.W.2d 17 (1960).

¶ 23. The petitioners argue, however, that the ability of the County to regulate commercial ground transportation at the Airport is limited by Wis. Stat. § 114.14(3)(b)1. It provides that "[t]he public may in no case be deprived of equal and uniform use of the airport." Citing to this court's decision in *Wussow v. Gaida,* 251 Wis. 328, 29 N.W.2d 42 (1947), they assert that the "equal and uniform use" requirement under § 114.14(3)(b)1 applies to commercial entities as well as to non-commercial entities. They contend that prohibiting taxis without Airport permits from making prearranged pickups at the Airport deprives the public of equal and uniform use of the Airport. Thus, because Ordinance 4.05 has such a prohibition, it conflicts with state law, and therefore is invalid.

¶ 24. While § 114.14 allows counties to regulate commercial ground transportation at airports, a county may not promulgate regulations that are inconsistent with state legislation. A county "has only such powers as are expressly conferred upon it or necessarily implied from the powers expressly given or from the nature of the grant of power." *Teunas,* 142 Wis. 2d at 504 (quoting *Town of Vernon v. Waukesha County,* 102 Wis. 2d 686, 689, 307 N.W.2d 227 (1981)). "As a creature of the legislature, a county must exercise its powers within the scope of authority that the State confers upon it." *Mommsen v. Schueller,* 228 Wis. 2d 627, 634–35, 599 N.W.2d 21 (Ct. App. 1999)(citation omitted). Where a

county promulgates an ordinance that conflicts with its statutory authority, it is an invalid exercise of authority. *Teunas,* 142 Wis. 2d at 515–16. Where a local governmental body enacts an ordinance pursuant to express statutory authority, "all presumptions are in favor of its validity, and any person attacking it must make the fact of its invalidity clearly appear." *State ex rel. B'nai B'rith Found. v. Walworth County Bd. of Adjustment,* 59 Wis. 2d 296, 307, 208 N.W.2d 113 (1973) (quoting *Newman v. Pagels,* 212 Wis. 475, 479, 250 N.W. 430 (1933)).

¶ 25. In determining whether Ordinance 4.05 conflicts with the statute, and is therefore not within the County's authority, we examine both the language of the Ordinance and the relevant provisions of the statute. Ordinance 4.05(3)(b) sets forth the requirement that taxis must have an Airport permit in order to conduct business at the Airport:

> 4.05(3)(b) License, permits, fees.
>
> . . . .
>
> (3)(a) On and after September 1, 1990, taxicab owner permits will be issued only to those owners who whose vehicles(s) have been permitted during the period October 1, 1989, through July 5, 1990. Taxicab owner permits must be renewed and remain in full force and effect on a continuous basis . . . . In the event an owner does not renew the taxicab owner permit prior to the annual dates prescribed herein below, that owner shall forfeit his/her privilege to operate at the airport. . . .
>
> (5) Any person who is not in possession of the necessary permits required under this section and who operates a taxicab at General Mitchell International Airport in such a manner as to constitute doing business, or who attempts to do business thereon shall, without limita-

147

tion because of enumeration, be deemed to be in violation of chapter 4 of the Code. . . .[7]

At the same time, however, Ordinance 4.05 does allow limousines without Airport permits to conduct business transporting passengers from the Airport on a prearranged basis. Milw. County Ord. 4.05(6)(a)(2).[8]

¶ 26. Milwaukee County Ordinance 4.08(2)(b) sets forth the penalties for violating section 4.05(3)(b):

> (b) Commercial ground transportation violations. Persons violating section 4.05 of this chapter . . . shall, upon conviction of the violation, forfeit to the county a sum not less than one hundred dollars ($100.00) nor more than five hundred dollars ($500.00) as the court in its discretion shall determine, together with the costs of the action to collect such forfeiture, and upon default of payment thereof, such persons shall be imprisoned in the county jail or the house of correction in the county for a period of not less than five (5) days nor more than ninety (90) days in the discretion of the court.

¶ 27. Section 114.14(3) provides in relevant part:

> (3)(a) Except as provided in par. (b), in carrying out its duties the airport commission may do any of the following:
>
> . . . .

---

[7] A taxi that drops off passengers at the Airport is not doing business under the meaning of 4.05(3):

> A taxicab driver entering upon General Mitchell International Airport for the sole purpose of discharging a taxicab patron at said airport shall not be deemed to be doing business thereon if, after discharging said passenger, he/she shall immediately leave the airport premises.

Milw. County Ord. 4.05(3)(b)(5).

[8] "[L]imousines must operate on a pre-reserved (reservation) basis only . . . ." Milw. County Ord. 4.05(6)(a)(2).

148

(b) The exercise of authority by the airport commission under par. (a) shall be subject to all of the following conditions:

1. The public may in no case be deprived of equal and uniform use of the airport.

¶ 28. In *Wussow,* this court examined § 114.14(3) and focused on the provision that the public may not be "deprived of equal and uniform use of the airport." Wussow leased the Shawano Municipal Airport from the Shawano County airport committee. Under the lease, Wussow was to operate the airport and receive the income from concessions and rentals. 251 Wis. at 329–30. Gaida operated a business adjacent to the airport that sold aircraft, gave flying instruction, and provided a taxi service. He had used the airport for two years prior to Wussow's lease, and continued to use the airport after the lease had been executed. *Id.* at 330.

¶ 29. Wussow sought to enjoin Gaida's use of the airport on the grounds that giving flying lessons and providing taxi services impinged on Wussow's rights under the contract and caused him to lose profits. *Id.* at 330–31. The circuit court granted the injunction. On review, this court determined that the lease did not provide Wussow with the right to exclusive commercial use of the airport because § 114.14(3) prohibits depriving the public of equal and uniform use of airports:

> The lease itself does not attempt to give [Wussow] the right to *arbitrarily* exclude members of the public from the use of the airport, as indeed it could not, for sec. 114.14(3), Stats., clearly precludes the granting of such a right. That section provides that although contracts may be made with private parties for the operation of municipal airports, they may in no case deprive the public of equal and uniform use of the airports.

149

*Id.* at 331 (emphasis added).[9]

¶ 30. Further, the *Wussow* court declined to adopt the argument that § 114.14(3) requires equal and uniform use only for private use. Rather, it determined that "no distinction between private or personal and commercial use can be read into the clear words of the statute." *Id. Wussow* makes clear that under § 114.14(3)(b)1, arbitrarily excluding members of the public (whether private or commercial) from the use of the Airport will constitute depriving the public of equal and uniform use of airports.

¶ 31. We recognize that in regulating an airport there may be many instances of unequal or non-uniform treatment. Such unequal or non-uniform treatment does not by itself constitute "depriving" members of the public of equal and uniform use under the statute. Rather, according to *Wussow,* it is the arbitrary exclusion, which is to say exclusion without a reasonable justification, that "deprive[s] the public of equal and uniform use" of an airport under § 114.14(3)(b)1. Thus, in order to determine whether Ordinance 4.05 conflicts with § 114.14(3)(b)1, we must examine whether the exclusion is arbitrary, or whether there exists a reasonable justification for the unequal and non-uniform use of the Airport pertaining to the pre-reserved pickup.[10]

---

[9] The wording of Wis. Stat. § 114.14(3) was amended by 1999 Wis. Act 83, §§ 187–188. The changes do not affect the meaning of the statute for the purposes of the analysis here, and the language requiring that "[t]he public may in no case be deprived of equal and uniform use of the airport" was unchanged.

[10] The County argues that the express language of § 114.14(3) subjects only the exercise of authority by the airport commission to the condition that the public may not be deprived

¶ 32. In determining whether Ordinance 4.05 conflicts with § 114.14, we are limited by a sparse record. Nonetheless, the record before us indicates that under the open taxi system, there were problems of congestion, long waits for both taxis and customers, taxis refusing to provide short rides, traffic hazards, and fights among taxi drivers.

---

of equal and uniform use. Because Ordinance 4.05 is an exercise of the County's authority, rather than an exercise of an airport commission's authority, the County contends that the requirement that the public not be deprived of equal and uniform use is not applicable. This is incorrect.

Section 114.14(2)(a) provides that the "governing body of a city, village, town or county which has established an airport may vest jurisdiction for the construction, improvement, equipment, maintenance and operation of the airport in an airport commission. . . ." Once such a governing body has vested jurisdiction for the operation of an airport in an airport commission, "[t]he commission shall have complete and exclusive control and management over the airport for which it has been appointed." Wis. Stat. § 114.14(2)(e). Thus, the legislature intended that counties and other municipalities could establish commissions with complete control over airports, and that such commissions could not exercise control so as to deprive the public of equal and uniform use of those airports.

Here, the County has vested authority in an airport commission to operate the airport with "complete and exclusive" control. At the same time, however, it has promulgated a rule which arbitrarily deprives the public of equal and uniform airport use. The promulgation of such a rule allows the County to circumvent the statutory protection of the public's equal and uniform use of the Airport afforded by Wis. Stat. § 114.14(3)(b)1. Further, the County's authority to regulate the Airport is limited to the power conferred by the statute. *Mommsen v. Schueller*, 228 Wis. 2d 627, 634–35, 599 N.W.2d 21 (Ct. App. 1999)(citations omitted). Nothing in § 114.14 can be read to confer or imply authority for the County to exercise its power arbitrarily, so as to deprive members of the public of equal and uniform use of airports.

151

¶ 33. The record also indicates that under Ordinance 4.05, these problems have abated and that the taxis servicing the Airport are better maintained. The effect of the Ordinance on the problems that attended the open system is explained in an affidavit by the Airport Director, which was incorporated by reference into the stipulation of facts.[11]

¶ 34. The affidavit provides that the cap on the number of Airport taxi permits has decreased the wait time for both taxis and passengers:

> 4. Since the adoption of Mil. County Ord. 4.05, the number of permits issued to taxicabs has been capped at 50. Consequently, the wait time for fares has decreased to two to three hours and passenger wait time for a taxi has decreased to one to two minutes. Under the previous system, wait times were longer and passengers were less certain because there were often fewer cabs during off-peak hours and cabs often refused fares. The new system ensures enough business for the taxis so that they receive fares within a reasonable amount of time and gives them the incentive to return immediately to the airport, even during off-peak hours.

¶ 35. Further, the affidavit asserts that the cap on Airport taxi permits allows for greater inspection of taxis, relieves traffic congestion, and reduces traffic hazards.

> 5. . . . The limited number of cabs makes it possible for the staff to inspect periodically the permitted taxis. . . .
>
> 6. Capping the number of taxis at 50 has also reduced congestion problems. The staging area in front of the

---

[11] There is nothing in the stipulated facts that would counter the County's claim that the Ordinance has resolved the problems of the open system. The affidavits submitted by the petitioners address only the way that Quality Cab conducts its business and ways in which Ordinance 4.05 is anticompetitive.

terminal can only accommodate four taxis, and there is not enough room for taxis to double park. Under the "open" system, taxis would frequently clog the staging area by double parking, and fights between taxi drivers would break out due to the congestion and aggression caused by drivers cutting in line and jockeying for position. The limited space would also cause taxis to spill over into the roadway and create a hazard for passenger traffic. Under the current system the problems relating to overflow and double parking have been greatly reduced. . . .

¶ 36. Moreover, the affidavit contends that allowing taxis without Airport permits would add to congestion problems, but at the same time would not aid in providing reliable and efficient transportation for most of the Airport's customers.

7. There are good reasons for granting permits only to cabs that will base themselves at the Airport to provide a constant supply of cab services for arriving passengers. For example, since a Fond du Lac cab would not transport a customer who wanted to travel from the Airport to another location within the City of Milwaukee, the Fond du Lac cab would have less incentive to wait in the staging area for a fare. That would mean that the Fond du Lac cab would add to the congestion when it did appear but could not be relied upon to provide a steady supply of services to arriving passengers.

¶ 37. The County argues that these are precisely the kinds of benefits that justify regulation under § 114.14 and *Town of Lake*. By decreasing wait times, assuring adequate business, minimizing traffic hazards, and allowing inspections, the regulations ensure "good order," "efficiency," "prevent[ion of] confusion," and the "safety and comfort of the traveling public." *Town of Lake,* 259 Wis. at 231.

153

¶ 38. We agree that the record supports the County's argument that some regulation of taxi traffic comports with § 114.14. However, the Airport Director's affidavit does not proffer any sort of justification for prohibiting taxis without Airport permits from providing prearranged service, despite limousines being able to provide such service. Rather, the proffered justifications reflect reasons for limiting only taxis that provide curbside service.[12]

¶ 39. Taxis picking up prearranged fares need not wait in line with taxis offering curbside pickups, thereby contributing to congestion. Similarly, if taxis meeting prearranged fares are not in line with the curbside taxis, they would not contribute to taxi traffic spilling onto the Airport's roadway. Because prearranged taxi service must by definition have been arranged ahead of time, there is no reason to suspect that the wait time for customers would increase if non-permitted taxis could retrieve prearranged fares from the Airport. Finally, were some passengers to use taxis for prearranged service, it would not affect the ability of the Airport to inspect its permitted taxis regularly to assure that they are well-maintained.

¶ 40. Thus, the County's proffered justifications for Ordinance 4.05 relate only to the Ordinance's restrictions on taxis' ability to provide curbside service, and provide no justification for precluding taxis without permits from providing prearranged service. However, under the Ordinance only limousines may provide prearranged service without Airport permits.

---

[12] The dissent asserts that the majority is forcing Milwaukee County to return to an open system. Dissent, ¶ 83. This assertion is incorrect and should not be allowed to cause confusion.

¶ 41. Similar to *Wussow,* a commercial enterprise has been arbitrarily excluded from using an airport, depriving it of equal and uniform use under § 114.14(3)(b)1. 251 Wis. at 331. More importantly, the Ordinance arbitrarily limits the options of the general public—the people who need to make the transportation arrangements. They do not have the option of choosing a taxi without a permit for prearranged pickups from the airport.[13]

¶ 42. The County contends that passengers wanting pre-arranged taxi service from the petitioners may take a shuttle to an off-Airport location and meet the taxi for a prearranged ride there, and that the petitioners could offer prearranged service by providing limousine services. These arguments miss the mark. The issue is whether prohibiting taxis without permits from making prearranged pickups, and depriving the public from meeting prearranged taxis at the Airport, is justi-

---

[13] Milwaukee County Ordinance 4.05(5)(a) also provides that "out-of-county shuttle services" may operate on a prearranged basis from the Airport:

> "Out-of-county" shuttle service, under this subsection shall mean a company, partnership or person which operates on a prereserved basis from General Mitchell International Airport to destinations beyond the county limits.

> The vehicle(s) which make up "out-of-county" shuttle service(s) shall be van(s) regularly engaged in the business of carrying passengers for hire, having a maximum seating capacity of twenty-two (22) persons behind the driver, with heating and air conditioning and be in good operating condition.

Milw. County Ord. 4.05(5)(a). The record does not provide details about such services. It is unclear from the record whether such service operates in Fond du Lac. However, the possibility of prearranged van services does not affect the analysis here, for it does not provide a reason for excluding taxis without Airport permits from providing prearranged services.

fied in the first instance. The possibility that the petitioners could expand their business to include a limousine service or meet passengers at other locations does not provide a justification for prohibiting taxis without Airport permits from providing prearranged pickups.

¶ 43. The County also asserts, based on an affidavit, that it "does not limit the number of limousine operators due to a federal law applicable to interstate limousine transports."[14] However, the question in this

---

[14] Neither the affidavit nor the briefs cite to a statute or case law on this point. The County may be referring to *Executive Town & Country Servs., Inc. v. City of Atlanta*, 789 F.2d 1523, 1525–26 (11th Cir. 1986). In that case, the Eleventh Circuit determined that while taxis generally do not operate in the stream of interstate commerce, a limousine service that received the vast majority of its business from an international airport, received many of its incoming calls on 800 number lines, and served multi-national corporate clients was within the stream of interstate commerce. *Id.* at 1525–26. *See also Charter Limousine, Inc. v. Dade County Bd. of County Comm'rs*, 678 F.2d 586 (Former 5th Cir. 1982); *United States v. Yellow Cab Co.*, 332 U.S. 218, 231–32 (1947).

The dissent posits that the County is instead referring to 49 U.S.C. § 14501(d). This seems unlikely because that statute clearly states that it does not limit airports from providing preferential access to providers of pre-arranged ground transportation services:

(3) Matters not covered. Nothing in this subsection shall be construed—

. . .

(B) as prohibiting or restricting an airport, train, or bus terminal operator from contracting to provide preferential access or facilities to one or more providers of pre-arranged ground transportation service . . . .

49 U.S.C. § 14501(d)(3) (2006).

case is whether the limitation on taxis without Airport permits providing prearranged pickups is justified by the benefits outlined in the County's affidavits, not whether the County has the power to restrict the number of limousines providing services at the Airport. The County has provided nothing in the record to support the claim that allowing taxis without permits to make prearranged pickups would create the problems associated with the open system, even though prearranged service by limousines does not cause such problems.

¶ 44. As the *Wussow* court noted, such arbitrary exclusions conflict with the rule under § 114.14(3)(b)1 that "[t]he public may in no case be deprived of equal and uniform use of the airport." We therefore determine that precluding taxis without Airport permits from providing prearranged services conflicts with § 114.14(3)(b)1 and is an invalid exercise of the County's authority. To that extent, Ordinance 4.05 is invalid and therefore unenforceable.

## IV

¶ 45. We consider next Williams and Hegney's arguments that by requiring taxis to have one of a limited number of permits in order to do business at the Airport, Ordinance 4.05 conflicts with Wis. Stat. §§ 133.01, 349.24, and 194.02.

¶ 46. The essence of their argument under § 133.01 is that every single Wisconsin statute that affects economic competition must be interpreted through the lens of § 133.01. They argue that the section "establish[es] a clear public policy governing all regulatory agencies in this state that requires maximiz-

ing economic competition, including commercial ground transportation, subject only to those limits necessary to achieve the legislature's goals." They contend that the decision in *Cedarhurst Air Charter, Inc. v. Waukesha County*, 110 F. Supp. 2d 891 (E.D. Wis. 2000), and this court's decision in *American Med. Transp. of Wisconsin, Inc. v. Curtis-Universal, Inc.*, 154 Wis. 2d 135, 452 N.W.2d 575 (1990), warrant a broad application of § 133.01. Thus, they argue, any regulation must "employ the least anticompetitive means to achieve any legislatively mandated goal."

¶ 47. The petitioners' view is supported by neither the language of § 133.01 nor the cases cited. Further, the petitioners' view would subject the enforcement of any regulation affecting competition to litigation regarding the regulation's effect on competition. We therefore decline to adopt it here.

¶ 48. Chapter 133 of the Wisconsin Code is titled "Trusts and Monopolies." The first section of the chapter, § 133.01, is captioned "Legislative Intent" and states:

> The intent of *this chapter* is to safeguard the public against the creation or perpetuation of monopolies and to foster and encourage competition by prohibiting unfair and discriminatory business practices which destroy or hamper competition. It is the intent of the legislature that *this chapter* be interpreted in a manner which gives the most liberal construction to achieve the aim of competition. It is the intent of the legislature to make competition the fundamental economic policy of this state and, to that end, state regulatory agencies shall regard the public interest as requiring the preservation and promotion of the maximum level of competition in any regulated industry consistent with the other public interest goals established by the legislature.

(Emphasis added). The section expressly describes the legislature's intent as applying to *this* chapter (that is,

chapter 133), and nowhere states that it is the intent of the section that the entire Wisconsin Code be interpreted in light of § 133.01. Rather, the section applies in circumstances in which parties assert violations of antitrust law.

¶ 49. The petitioners' contention that case law supports the view that § 133.01 should be used to interpret all state actions regulating competition is incorrect. The case law cited by the petitioners supports the view that § 133.01 applies when a party brings a cause of action in antitrust. *American Medical Transport* involved a complaint filed by three private ambulance companies alleging that the City of Milwaukee and four other private ambulance companies had violated § 133.03 of the state antitrust law. 154 Wis. 2d at 138. The complaint concerned a system that gave the four defendant companies primary responsibility for the city's ambulance service and relegated the plaintiff companies to providing backup service. *Id.* at 139.

¶ 50. The circuit court granted the defendants' motions to dismiss on the ground that the city was authorized to implement such a system under home-rule authority pursuant to Wis. Stat. § 62.11(5). *Id.* at 141. This court relied upon § 133.01 in considering whether § 62.11(5) did in fact authorize such "anticompetitive, monopolistic regulation." *Id.* at 151. It determined that under § 133.01, "we should not lightly reach the conclusion that monopoly or restraint of trade is authorized by extraneous statutes that do not quite clearly indicate that intent." *Id.* at 151–52. Thus, it allowed the plaintiffs' antitrust suit to move forward.[15]

---

[15] Wis. Stat. § 133.03 no longer applies "to ambulance service contracted for under ss. 59.54(1), 60.565, 61.64 and 62.133." Wis. Stat. § 133.03(4).

¶ 51. In *Cedarhurst,* the plaintiff claimed that Waukesha County had conspired with the operator of Waukesha County Airport to monopolize the market for aircraft fuel, in violation of federal antitrust laws, specifically 15 U.S.C. §§ 1–2. 110 F. Supp. 2d at 892–93. The county moved to dismiss, asserting that the claims were barred by state action immunity. *Id.* (citing *Parker v. Brown,* 317 U.S. 341 (1943)). Specifically, the county stated that it was immune on the ground that § 114.14 gave it wide authority to engage in anticompetitive conduct. In its consideration of whether the legislature intended that § 114.14 authorize the county's conduct, the court recognized that § 133.01 requires that courts liberally interpret statutes to promote competition. *Id.* at 895. The court determined that § 114.14 did not provide the " 'clear articulation of a state policy to authorize anticompetitive conduct' needed to support [the county's] defense of state action immunity." *Id.* at 895 (quoting *City of Columbia v. Omni Outdoor Adver., Inc.,* 499 U.S. 365, 372 (1991)).

¶ 52. Both *American Medical Transport* and *Cedarhurst* involved causes of action under antitrust law. In each case, § 133.01 was used as an interpretive tool in determining whether a statute had authorized the regulation that formed the basis of the antitrust action. In contrast to *American Medical Transport,* in which plaintiffs alleged violations of § 133.03, and in contrast to *Cedarhurst,* where plaintiffs alleged violations of the Sherman Antitrust Act, Williams and Hegney's only assertion of a violation of antitrust laws comes from its invocation of § 133.01.[16]

---

[16] We note, too, that. § 133.01 expressly applies to "state regulatory agencies." We decline to address whether Milwaukee County is a state regulatory agency under § 133.01.

¶ 53. The petitioners concede that their view of § 133.01 does not give rise to an independent cause of action. However, that assertion belies the potential sweep of their interpretation of § 133.01. In the petitioners' view, because there is some less restrictive alternative to the Ordinance consistent with the goals of the statutes that authorize the Ordinance, the Ordinance conflicts with the statutes as a matter of law.

¶ 54. As the Attorney General notes in an amicus brief, every form of economic regulation restrains trade to some degree. However, the petitioners' theory would allow as a defense to any enforcement action of any such regulation the claim that there is a less restrictive alternative consistent with the statute authorizing the regulation. Thus, even if § 133.01 does not give rise to a cause of action in its own right, the petitioners' theory has the potential to precipitate litigation across every area of economic regulation in the state. In their view, any time a party is cited for a violation of a regulation, that party could assert that the regulation is unenforceable because there is a less restrictive alternative consistent with the goals of the statute authorizing the Ordinance.

¶ 55. The Supreme Court noted in *Exxon Corp. v. Governor of Maryland* that "if an adverse effect on competition were, in and of itself, enough to render a state statute invalid, the States' power to engage in economic regulation would be effectively destroyed." 437 U.S. 117, 133 (1978). As a corollary, we could add that if a regulation's adverse effect on competition allowed an affirmative defense that less restrictive means were available, this state's power to engage in economic regulation would be hobbled. We therefore determine that Ordinance 4.05 does not conflict with § 133.01.

161

¶ 56. The petitioners' argument that Ordinance 4.05 conflicts with Wis. Stat. § 349.24 is also unavailing. Under that section, city councils and village and town boards may regulate and license taxis and drivers. Wis. Stat. § 349.24(1).[17] Further, taxis and drivers licensed by any city, village or town may not be required to procure such a license "in any other municipality for the purpose of carrying taxi passengers for hire from one municipality to another." Wis. Stat. § 349.24(2). The petitioners argue that the requirement under Ordinance 4.05(3)(b)(3) that taxis doing business at the Airport have an Airport permit conflicts with § 349.24(2), and is therefore unenforceable.

¶ 57. The petitioners' view is contrary to the very words of the statute. As the court of appeals here

---

[17] Wis. Stat. § 349.24 provides in relevant part:

Authority to license taxicab operators and taxicabs. (1) The council of any city and every village or town board may:

(a) Regulate and license chauffeurs and operators of taxicabs used for hire;

(b) Regulate and license the taxicab business by licensing each taxicab used for hire;

(c) Prohibit any person from operating any motor vehicle for taxicab purposes upon the highways of the city, village or town unless the person is licensed as a chauffeur and operator and unless the taxicab business is licensed by the licensing of each taxicab;

(d) Revoke any license mentioned in this section when in its judgment the public safety so requires.

(2) Any person licensed by any city, village or town as a chauffeur and operator shall not be required to procure either a chauffeur's and operator's license or a taxicab license in any other municipality for the purpose of carrying taxicab passengers for hire from one municipality to another, but this exception does not permit the chauffeur or operator to operate a taxicab wholly within the limits of any municipality in which the chauffeur or operator is not licensed.

explained, § 349.24 makes no mention of counties or airports. 295 Wis. 2d 389, ¶ 21. Further, Wis. Stat. § 349.01 provides that words used in chapter 349 are used in the same sense as those words are defined in Wis. Stat. § 340.01. Section 340.01(36m) states that " '[m]unicipality' means city, village or town." Neither the county nor the Airport is a municipality under this definition. Thus, the restrictions in § 349.24(2) that prevent "municipalities" from requiring licenses from taxis and drivers with licenses from other municipalities do not pertain to the permits required under Ordinance 4.05, for neither the County nor the Airport is a municipality in the relevant sense.

¶ 58. We also agree with the court of appeals that the purpose of § 349.24 is to allow taxis and drivers to convey passengers through cities, towns, and villages without having to obtain a license in each one. 295 Wis. 2d 389, ¶ 21. In contrast, the permit requirement of Ordinance 4.05(3)(b)(3) is to promote efficient and safe ground transportation at the Airport. Regulations promoting this goal are within the County's purview under § 114.14(1) and *Town of Lake.* 259 Wis. at 231. Thus, we determine that § 349.24 does not conflict with Ordinance 4.05.

¶ 59. The petitioners' final statutory argument is based on § 194.02. That section states:

> It is the intent of the legislature to remove the economic regulations which limit motor carrier operations in the state. The legislature intends to let the market promote competitive and efficient transportation services, while maintaining the safety regulations necessary to protect the welfare of the traveling and shipping public. It is the intent of the legislature that this chapter be interpreted in a manner which gives the

most liberal construction to achieve the aim of a safe, competitive transportation industry.

The petitioners maintain that the statement of intent to promote "competitive and efficient transportation services" in § 194.02 extends to the regulation of taxis. They argue that the language of § 194.02 requires that regulation of any transportation services be "the minimum necessary to achieve the other goals the legislature has adopted." Because Ordinance 4.05 is not the minimum regulation necessary to achieve other legislative goals, the petitioners claim that the Ordinance is unenforceable on the ground that it contradicts § 194.02.

¶ 60. Their argument, however, is belied by the express scope of chapter 194. The very first subsection of the chapter, § 194.01(1), specifically excludes taxis from the definition of "common motor carrier." It states:

> "Common motor carrier" means any person who holds himself or herself out to the public as willing to undertake for hire to transport passengers by motor vehicle between fixed end points or over a regular route upon the public highways or property over regular or irregular routes upon the public highways. *The transportation of passengers in taxicab service . . . shall not be construed as being that of a common motor carrier.*

(Emphasis added.) The other two types of vehicles covered by the section ("contract motor carrier" and "private motor carrier") do not include taxis, for both are defined as transporting property rather than passengers.[18]

¶ 61. The petitioners argue that § 194.02's statement of intent "to let the market promote competitive and efficient transportation services" is not specific to

---

[18] Wis. Stat. §§ 194.01(2), (11).

motor carriers, and therefore applies to regulations regarding taxis. However, that statement follows a sentence specifically stating that the intent of the legislature is to remove regulations "which limit *motor carrier operations*" (emphasis added). Thus, one sentence in a statement of legislative intent refers to "transportation services," while the rest of the chapter expressly excludes taxis from its scope. This is simply not a sufficient foundation to conclude that any regulation of taxis must be the least restrictive to competition consistent with legislative goals, as the petitioners claim. We therefore determine that the Ordinance does not conflict with § 194.02.

¶ 62. Accordingly, we conclude that the requirement under Ordinance 4.05 that taxis have one of a limited number of permits in order to do business at the Airport does not conflict with Wis. Stat. §§ 133.01, 349.24, or 194.02. Section 133.01 does not give rise to an independent cause of action, § 349.24 does not apply to counties or airports, and taxis are explicitly excluded from the scope of chapter 194.

■

¶ 63. Finally, the petitioners assert that the restriction on prearranged taxi service in Ordinance 4.05 is an unconstitutional interference with interstate commerce. However, it is fundamental that a court should not reach a constitutional question unless it is essential to the determination of the case before it. *Kollasch v. Adamany,* 104 Wis. 2d 552, 561, 313 N.W.2d 47 (1981). Because we determine that by prohibiting taxis without Airport permits from accepting prearranged fares, Ordinance 4.05 conflicts with § 114.14 and to that extent is invalid and unenforceable, we do not reach the constitutional question.

## V

¶ 64. In sum, we determine that Ordinance 4.05, which prohibits taxis without Airport permits from making prearranged pickups, conflicts with the requirement under § 114.14 that the public have equal access to airport services, and to that extent is invalid and unenforceable. However, we determine that Ordinance 4.05 does not conflict with Wis. Stat. §§ 133.01, 349.24, and 194.02. Because our decision rests on statutory grounds, we do not reach the question of whether the restrictions on prearranged taxi service in Ordinance 4.05 impermissibly interfere with interstate commerce. Accordingly, we reverse the court of appeals, and remand the cause to the circuit court with instructions to vacate the judgments of conviction.

*By the Court.*—the decision of the court of appeals is reversed and the cause is remanded to the circuit court.

¶ 65. DAVID T. PROSSER, J. (*dissenting*). This case interprets Milwaukee County's power to regulate ground transportation at General Mitchell International Airport. Although I might seek changes to Milwaukee County's Ordinance 4.05 if I were a member of the Milwaukee County Board, this court should not force changes to the ordinance unless there is very clear proof that the ordinance is invalid. Because I am not persuaded that the petitioners have satisfied their burden to establish invalidity, I respectfully dissent.

## I

¶ 66. The Wisconsin Legislature has given local governments broad powers to "construct, improve, equip, maintain and operate" an airport. Wis. Stat. § 114.14(1). "The governing body of a city, village, town or county may adopt regulations, and establish fees or charges for the use of such airport." *Id.*

¶ 67. Pursuant to the authority granted to Milwaukee County by this statute, the County Board adopted Milwaukee County Ordinance 4.05. The ordinance provides in part:

> (1) Purpose. The purpose and intent of this section is to regulate all commercial ground transportation *including prereserved (reservation) service,* by the issuance of permit(s) to both those owning or operating a commercial ground transportation service and those driving commercial ground transportation vehicles at General Mitchell International Airport. *Prereserved (reservation) service means ground transportation that is contracted for prior to the actual time passengers are picked up.*
>
> . . . .
>
> (3) Taxicabs.
>
> (a) Definition. "Taxicab" under this section is a motor vehicle regularly engaged in the business of carrying passengers for hire, with heating and air conditioning, be in good operating condition, metered, and not operated on an affixed route.
>
> (b) License, permits, fees.
>
> (1) An owner or operator of a taxicab shall not do business or attempt to do business on General Mitchell International Airport unless such owner or operator has been licensed as owner or operator of a taxicab business by any city, village or town consistent with Wis. Stats. § 349.24, and unless such license remains in full force and effect.
>
> . . . .
>
> (3)(a) On and after September 1, 1990, taxicab

owner permits will be issued only to those owners whose vehicle(s) have been permitted during the period October 1, 1989, through July 5, 1990. Taxicab owner permits must be renewed and remain in full force and effect on a continuous basis, in accordance with subparagraph (b) below. In the event an owner does not renew the taxicab owner permit prior to the annual dates prescribed herein below, that owner shall forfeit his/her privilege to operate at the airport. *At such time that the total number of taxicab permits issued decreases below fifty (50), additional permits, to maintain the total issued at fifty (50), will be issued to those taxicab owners who are on the waiting list.* Permits will be issued based upon date of request on the waiting list. In the event of extraordinary circumstances, i.e. large conventions, inclement weather or inability of the permitted taxicab fleet to meet immediate passenger demand, the airport director or his/her designated representative is authorized to request temporary taxicab service from local providers in order to meet such extraordinary demand. Additional taxicabs will follow all policies, rules and regulations pertaining to the operation of taxicabs at General Mitchell International Airport.

. . . .

(5) Any person who is not in possession of the necessary permits required under this section and who operates a taxicab at General Mitchell International Airport in such a manner as to constitute doing business, or who attempts to do business thereon shall, without limitation because of enumeration, be deemed to be in violation of chapter 4 of the Code. A taxicab driver entering upon General Mitchell International Airport for the sole purpose of discharging a taxicab patron at said airport shall not be deemed to be doing business thereon if, after discharging said passenger, he/she shall immediately leave the airport premises.

168

Milwaukee County, WI, Code of General Ordinances, ch. 4 (2006) (emphasis added).

¶ 68. Persons challenging this ordinance have a heavy burden. The police power of the state, exercised by municipalities under the authority of the legislature, extends to the public safety, health, morals, and general welfare. *Highway 100 Auto Wreckers, Inc. v. City of West Allis,* 6 Wis. 2d 637, 643, 96 N.W.2d 85 (1959), *rehearing denied,* 6 Wis. 2d 637, 97 N.W.2d 423 (1959). The police power embraces regulations designed to promote the public convenience or general prosperity. *Courtesy Cab Co. v. Johnson,* 10 Wis. 2d 426, 432, 103 N.W.2d 17 (1960). "This court has often recognized the principle that the court will not interfere with the exercise of police power by a municipality unless the illegality of the exercise is clear." *Highway 100 Auto Wreckers,* 6 Wis. 2d at 643. "If there are any reasons which can fairly have weight, the reasons for a given ordinance are for the legislative body and not for the courts." *Courtesy Cab,* 10 Wis. 2d at 432.

¶ 69. The county "does not have the burden of proving the validity of its ordinance . . . . Rather, [a challenger] has the burden of showing its invalidity." *State ex rel. B'nai B'rith Found. v. Walworth County Bd. of Adjustment,* 59 Wis. 2d 296, 307, 208 N.W.2d 113 (1973). "[W]here a municipal body enacts regulations pursuant to authority expressly granted, all presumptions are in favor of its validity, and any person attacking it must make the fact of its invalidity clearly appear." *State ex rel. Newman v. Pagels,* 212 Wis. 475, 250 N.W. 430 (1933).

¶ 70. The majority opinion carefully explains the history and purpose of the County ordinance. *See* majority op., ¶¶ 7, 8, 9, 11, 32, 33, 34, 35, 36, and 37. This is summarized well in the following sentences:

169

Since the adoption of Ordinance 4.05, the problems of the open system have abated. The time that taxis must wait for fares has decreased, and the time that passengers must wait for curbside taxi service has decreased. The cap on taxi permits has reduced the congestion problems, and taxis no longer spill into the Airport roadway to create a hazard for other Airport traffic.

*Id.,* ¶ 11.

¶ 71. Surprisingly, the majority invalidates the ordinance in part in spite of this success.

## II

¶ 72. To support their attack on Ordinance 4.05, petitioners point to Wis. Stat. § 114.14(3)(b)1.: "(b) The exercise of authority by the airport commission under par. (a) shall be subject to all of the following conditions: 1. *The public may in no case be deprived of equal and uniform use of the airport.*" (Emphasis added.) They contend that Ordinance 4.05(3)(b)(5), prohibiting the operation of a taxicab at General Mitchell International Airport without a permit, violates the statutory rule on "equal and uniform use of the airport" if the taxicab merely picks up passengers on a "prearranged" or "prereserved" basis. They argue that it is not within the County's authority to treat taxis without permits differently from luxury limousines (which are not required to have airport permits) with respect to providing prearranged service at the Airport. *See* majority op., ¶ 19.

¶ 73. They also argue that it is not within the County's authority to require taxis to have one of a limited number (50) of Airport permits to do business at the Airport. *Id.* According to petitioners, "[f]orbidding the provision of [prereserved] service [by taxis without

permits] serves only to protect the favored 50 Milwaukee taxis and the providers of more expensive prereserved services from competition."

¶ 74. Before responding to these arguments, it is helpful to understand the history of the language at issue. The present sentence, "The public may in no case be deprived of equal and uniform use of the airport," Wis. Stat. § 114.14(3)(b)1., first appeared in our statutes in slightly different form in 1943. *See* § 15, ch. 269, Laws of 1943. Newly created § 114.14(3) gave airport commissions certain powers, including the power to "contract with private parties for the operation of the airport, including all necessary arrangements for the improvement and equipment and successful operation thereof. Provided, that in no case shall the public be deprived of equal and uniform use of the airport." Wis. Stat. § 114.14(3) (1943).

¶ 75. Legislative Reference Bureau drafting records for 1943 S.B. 123, the source of Chapter 269, do not explain this proviso. Although the drafting records are incomplete, they show that the bill went through significant drafting changes before introduction. At some point, the bill drafter appears to have borrowed language from the Uniform Airports Act, promulgated by the National Conference of Commissioners on Uniform State Laws in 1935.

¶ 76. For instance, Section 5 of the Uniform Airports Act reads in part:

> Section 5. Authority to Equip, Improve, Establish Fees and Charges and Lease.—Counties, municipalities, or other political subdivisions of this state which have established or may hereafter establish airports or landing fields, or which acquire, lease, or set apart real property for such purpose or purposes, are hereby authorized:

(a) *to construct, equip, improve, maintain, and operate* the same, or to vest authority for the *construction, equipment, improvement, maintenance, and operation* thereof, in an officer, board or body of such political subdivision. . . .

. . . .

(c) to lease for a term not exceeding [ ] years such airports or landing fields to private parties for operation, or to lease or assign for a term not exceeding [ ] years to private parties for operation space, area, improvements, and equipment on such airports or landing fields, *provided in each case that in so doing the public is not deprived of its rightful, equal and uniform use thereof.*

Handbook of the National Conference of Commissioners on Uniform State Laws and Proceedings of the Forty-Fifth Annual Conference, Uniform Airports Act 216–17 (1935) (emphasis added).[1] The underscored words were substantially incorporated into Wis. Stat. § 114.14(3) (1943).

¶ 77. Admittedly, the language of our statute is somewhat broader than the language of the uniform law. This helps to explain the comment in *Wussow v. Gaida,* 251 Wis. 328, 331, 29 N.W.2d 42 (1947), that "no distinction between private or personal and commercial use can be read into the clear words of the statute." Yet, the *Wussow* decision—which is vital to petitioners' argument —was influenced by more than the language of the statute. Both the statute and *Wussow* were influenced by contemporary practices.

¶ 78. In a 1941 article, John M. Hunter, Jr., an attorney for the Civil Aeronautics Administration of the United States Department of Commerce, wrote:

---

[1] *See also* Ga. Code Ann. § 6–3-25(3) (1995); S.C. Code Ann. § 55–9-190(3) (1992); Utah Code Ann. § 72–10–207(1)(c) (2001).

172

The principal legal developments of interest in the field of airport operation during the last year [1940] were with regard to the leasing of municipal airports or airport facilities to private persons and the grant by cities of airport operating privileges. These developments included the adoption of several city resolutions authorizing airport leases and grants of privileges and concessions . . . .

In addition to these developments, there have been three cases in which informal complaint has been made to the Civil Aeronautics Authority of violation of the exclusive right provision of Section 303 of the Civil Aeronautics Act of 1938, which reads: "There shall be no exclusive right for the use of any landing area or air navigation facility upon which Federal funds have been expended." In all of these cases the complaint was that the city in question had granted a private operator an exclusive right to conduct commercial flying activities at the municipal airport, including operation of a flying school and a charter flying service.

John M. Hunter, Jr., *Airport Legal Developments of Interest to Municipalities—1940,* The Journal of Air Law and Commerce 153 (Vol. XII, 1941) (citation omitted).

¶ 79. Hunter's article was prescient, for it anticipated the very facts of the *Wussow* case. Wussow entered into a lease to operate the Shawano Municipal Airport and to "have sole charge of said airport." *Wussow,* 251 Wis. at 329–30. Gaida, who owned an aircraft sales company on adjacent land and had regularly used the airport for landing and taking off, continued to use the airport to give "flying instructions and taxi service" (likely meaning air charter service). *Id.* at 330. Wussow sought an injunction to bar such use, claiming that Gaida was forceably taking Wussow's rights under the contract and causing him "great loss in profits and

earnings." *Id.* This court reversed the circuit court and denied the injunction. It cited the procedural posture of the case as well as the language of the statute, then added: "The final answer to the immediate question must be arrived at in the light of this determination that [Wussow's] right to *equitable relief* does not exist. *We do not decide whether a cause of action at law may exist." Id.* at 331 (emphasis added).

¶ 80. Thus, close examination of the *Wussow* case suggests that petitioners may be reading too much into it. A 1958 opinion of the Wisconsin Attorney General presents a more balanced discussion of the law on airport contracts. The Attorney General concluded in summary:

> Where the county is the owner and operator of an airport it can lawfully lease space in its terminal building to a car rental agency upon the condition that it will not lease space to any other car rental agency, but it is doubtful whether it can lawfully exclude other rental agencies from soliciting business in the airport or terminal unless such regulation can be shown to be necessary for the convenience of the flying public or the efficiency of the operation of the airport.

47 Op. Att'y Gen. 29 (1958).

¶ 81. An annotation at 40 A.L.R.2d 1060 (1955) ("Validity, construction, and operation of airport operator's grant of exclusive or discriminatory privilege or concession") cites several cases upholding exclusive ground transportation service contracts at public airports. Thus, it is difficult to believe that the Wisconsin Legislature intended to hamstring the operation of Wisconsin airports by prohibiting the reasonable regulation of competition.

¶ 82. This background has a direct relationship to petitioners' argument that a 50–permit limit on taxicabs at the Airport violates Wis. Stat. § 114.14(3)(b)1. If

Milwaukee County may not limit the number of taxicab permits at its Airport, it is hard to see how it can limit the number of other service providers and vendors by regulation or contract.

¶ 83. Clearly, Quality Cab, which employs Williams and Hegney, is not the only taxicab company in the region that may wish to conduct a prereserved pick up and return business if an Airport permit is not required. Hence, the majority opinion appears to be forcing Milwaukee County to return to an open system. This would be a substitution of judicial policy for county regulation.

¶ 84. Milwaukee County Ordinance 4.05 is a comprehensive, detailed ordinance. It governs taxicabs (subsection 3), in-county shuttle service (subsection 4), out-of-county shuttle service (subsection 5), luxury limousines (subsection 6), courtesy cars (subsection 7), and buses (subsection 8), as well as car and truck rentals (subsection 9). The ordinance addresses prereserved service for taxicabs (4.05(3)(f)(7)), out-of-county shuttle service (4.05(5)(a)), and luxury limousines (4.05(6)(a)(2)).

¶ 85. The kind of prereserved taxicab service, without permit, contemplated by the majority will be in direct competition against (1) taxicabs with permits; (2) in-county shuttle service under negotiated contract and permit; and (3) out-of-county shuttle services that have paid for permits. Traffic congestion, fairness to permit holders, reliable service to the public, and revenue to the County all factor into the present regulatory scheme.

¶ 86. Unaccountably, the majority opinion faults the County for not anticipating and countering every argument the majority adduces in favor of open competition for prereserved taxicab service. *See, e.g.*, majority op., ¶ 39. After all, the County does not have the

175

burden of proving the validity of its ordinance. The majority's assumption that there will be no longer wait time if non-permitted taxis are able to retrieve prearranged fares at the Airport is, frankly, unrealistic. Passengers get out of their taxicabs when the cabs arrive at the Airport. Passengers get into their taxicabs after their planes arrive at the Airport *and* after they have picked up any luggage. No extra wait time? Even the residents of Lake Wobegon would smile at the suggestion that planes are never late and luggage is never delayed or lost at General Mitchell International Airport.

¶ 87. As for arbitrary discrimination, petitioners make much of the fact that luxury limousines are not required to have permits. This distinction appears to be based upon federal law, which prohibits local governments from requiring a license or fee for certain motor vehicles providing prearranged ground transportation service. *See* 49 U.S.C. § 14501(d).[2] Complying with federal law is not being arbitrary.

---

[2] 49 U.S.C. § 14501(d) (1955), reads as follows:

(d) Pre-arranged ground transportation.—

(1) In general.—No State or political subdivision thereof and no interstate agency, or other political agency of 2 or more States shall enact or enforce any law, rule, regulation, standard or other provision having the force and effect of law requiring a license or fee on account of the fact that a motor vehicle is providing pre-arranged ground transportation service if the motor carrier providing such service—

(A) meets all applicable registration requirements under chapter 139 for the interstate transportation of passengers;

(B) meets all applicable vehicle and intrastate passenger licensing requirements of the State or States in which the motor carrier is domiciled or registered to do business; and

(C) is providing such service pursuant to a contract for—

¶ 88. Milwaukee County Ordinance 4.05(3) is defensible as applied in these citations. Because the majority holds otherwise, I respectfully dissent.

¶ 89. I am authorized to state that Justice LOUIS B. BUTLER, JR., joins this opinion.

---

(i) transportation by the motor carrier from one State, including intermediate stops, to a destination in another State; or

(ii) transportation by the motor carrier from one State, including intermediate stops in another State, to a destination in the original State.